Turn to the third case on our calendar, Sea Tow Services International versus St. Paul Fire and Marine Insurance Company. Good morning, Your Honors, and may it please the Court. My name is Mitchell Stein, and I am counsel for the plaintiff appellant, Sea Tow Services International, Inc. I've reserved two minutes for rebuttal. Sea Tow International, I'm going to give a little background as to the parties and perhaps a slightly different look at the facts, which may reveal how the court below was in error. This is an appeal from a summary judgment decision by the district court against us, and we believe on a de novo review that when you look at the record and not the way in which the judge reviewed the record, you'll find out that there were genuine issues of material fact, if not an actual ruling in our favor, in Sea Tow International's favor. And I will point out some of the errors that are made and need to be corrected. Sea Tow International is a franchise organization that provides and has provided since 1983 nautical services in the nature of towing and salvage and related services as well to the nautical public, including the U.S. Coast Guard and frequently referred to as the eyes and ears of the Coast Guard. It has grown in size. It now has 90 franchisees. This is a case that concerns an injury that occurred to a captain employed by Sea Tow Miami. And the first thing I want to do is go over the parties because it's important. There is Sea Tow Services International, and it's the franchisor. To some extent, it has liability for the injury, but I'll get to how it does. There's Sea Tow Miami. That's the franchisee. There is St. Paul, which is the defendant. That's the insurance company that had policies with Sea Tow International. And there's RLI. That's the insurance carrier company that had policies with Sea Tow Miami. Now, here's what gets interesting. The franchise agreement explicitly has, and the court acknowledges it, that quotes it on page 4 of the decision, back-to-back indemnifications. So there are really four insurance companies here. The parties themselves insure each other. And what do they insure each other from? Direct claims. They have their own claims as well. Now, here we have a case where a captain was injured. How was he injured? A hook dislodged from the bow eye of a boat. The guy was trying to right the vessel and did it wrong, and it came apart, and a boomerang back at him took out one of his eyes. Now, who sold the hook? Sea Tow International sold the hook to Sea Tow Miami. Wouldn't an ordinary attorney think, first off, that there's an issue there? There's a product liability claim. There's a direct claim. And there's indemnification. Sea Tow Miami could collect from Sea Tow International. This claim wasn't even considered by our jury. But Sea Tow Miami only collects for Sea Tow International's negligent acts, right? And it's, yes. That's the indemnification agreement under 12.3 of the franchise agreement, right? Yes, you're correct. So it's only Sea Tow International's acts which raise an indemnification obligation, right? That's correct. And didn't St. Paul offer to settle with regard to any claims against Sea Tow International? Not brought by Sea Tow Miami. Excuse me? Not brought by Sea Tow Miami. Wait, no. You didn't hear my question. Sorry. The offer that St. Paul initially floated was to settle out Sea Tow International for its acts of negligence that caused the injury to the seaman, correct? No, no. It was brought by the seaman. It was brought by him. I understand. You're not listening to me. The seaman brought claims against Sea Tow International, right? Correct. Two types of claims. Vicarious liability, which are the acts of Sea Tow Miami that are imputed to Sea Tow International, correct? Yes. From some kind of either master-servant relationship, okay? And second of all, claiming that the ship was not seaworthy when it was sold by Sea Tow 2, Sea Tow International to Sea Tow Miami, and or that Sea Tow International did not train Sea Tow Miami's personnel with regard to use of the ship, correct? Failure to supervise them. And so if either of those last two claims were proven, the indemnification clause would kick in, correct? Correct. All right. Then Sea Tow International's carrier says we'll pay for the claims, to settle the claims that are against Sea Tow International for its negligence. Okay. Right? No. Then how does the indemnification—no? No. The claims brought by the plaintiff, Juan Fernandez. Correct. The claims brought by Sea Tow Miami because— Wait a second. There's no claim for indemnification. Presume Sea Tow—stop. Presume Sea Tow International did nothing, was not negligent at all. Okay. Would Sea Tow International have any indemnification requirements? No. Well, the— No. The answer is no. Including the hook or not including the hook? I said that there were no acts of negligence for Sea Tow International. Okay. Or products liability. Yeah. None. Okay. Right. There would be—right. But there were claims of negligence and products liability, correct? Sure. Right. And if a jury had awarded money for those injuries, the indemnification agreement would have kicked in, correct? Well, it would kick in before the award. But if Sea Tow International settles its claims with the injured seaman, there's no claims— Not true. None of the negligence of Sea Tow International ends up being a cost to Sea Tow Miami, and there's nothing to indemnify. I disagree completely, Your Honor. And I don't think that's right as a matter of law. Why? Because Sea Tow Miami didn't bring any claims. And you can't get a release against a party who doesn't assert a claim. You're talking—I'm sorry, but you're missing the point. And, Your Honor, Sea Tow— Stop. Stop. Okay. Forget it. Go ahead with your argument. Go ahead. I won't question you anymore. Go ahead. I don't mean— No, I didn't mean to interrupt you. Go right ahead. No, it's— No, go ahead. You hit a sizable point. But keep in mind as well that Sea Tow International, as a matter of fact, didn't sell any boats to Sea Tow Miami. And Sea Tow Miami, you know, it bought a hook, it's bought a number of hooks, would still have the claim of products liability. That wasn't released, nor was it even considered. And we're not dealing here with the outcome as much as we're dealing here with the bad faith and the conduct. You see, we have here—and I want to be certain that this is clear—St. Paul, the insurer for Sea Tow International, never considered the claims by Sea Tow Miami. That's because Sea Tow International and Sea Tow Miami had agreed not to bring them. They stood as one. That's why they wanted a global resolution of the case. And this is wholly ignored by the court below, as is—she quotes the back-to-back indemnifications, but she doesn't address them. And, Your Honor, you're pushing beyond the scope of what she decided. I'm not. You know what I'm doing? I'm trying to explore the legitimacy of your argument, which I'm having a hard time with. But that's okay. Go ahead and finish. Well, I would be willing to continue the dialogue. No, I'm not interested. I'm not interested. Okay, let me just say that a party that is not released has a claim. And you can't say that there are no damages here, because we have a $252,000 legal bill for periods of time when St. Paul didn't even appoint an attorney for Sea Tow International. And that's me, by the way. I was the guy there. And I will argue with Your Honor that Sea Tow Miami has its own series of damages, irrespective of its employee. And I see my yellow light is on, and I hope I've answered your question. I urge you to consider that, Your Honor. How can you have a release from a party who's not named? Thank you. Good morning. Steve Lazzeri for St. Paul. Let me just take a moment to press the reset button, so to speak, Your Honor. We had an insurance policy, a liability policy, which, like virtually all liability policies, gave the insurer the right and the discretion to settle claims, even if the insurer objected. Right. On top of that, we The policy could have included a provision that allowed the insurer to consent, could it? Could have, but it didn't. The premium would have been higher, right? It would have been higher, in all likelihood. Go ahead. Yes, Your Honor. On top of that, Your Honor, we have the Liberty case from the New York State Court of Appeals, which is pretty close to on point, and says, A cause of action for bad faith will not lie where the insurer, contrary to the wishes of the insured, has settled within the monetary limits of the policy under this type of policy. It's pretty clear. Now, CITO tries to evade the very straightforward and dispositive nature of the policy of Liberty by trying to take the PAVIA standard, which is the benchmark standard in New York for bad faith, and sort of superimposing it, retrofitting it onto the circumstances here. PAVIA says there can be bad faith when an insurance carrier fails to settle within limits at a time when it knows and a reasonable expectation that a jury might reward more than the failure to settle within the limits is a breach of the duty between the insurer and the insured and causes a bad faith claim for the excess. Right. Now, what we have here, Your Honor, is St. Paul is being accused not of failing to settle, but of trying to settle. We don't want you to settle within the limits. We want you to hold out and pay even more so that the franchisee will have some, you know, in effect, somebody to finance their out of the case. Tried to settle the case. In fact, the case did settle, fully defended to a fully insured resolution. There's not even a breach of contract claim pending anymore. CITO has now conceded there was no breach of contract. So what CITO is asking you to do is something pretty extraordinary, and that is find a PAVIA bad faith situation under these circumstances, something, to my knowledge, no New York court has ever done, and I suspect never would. So what Judge Chen did said, you know, I don't even need to get to all of that. Look at this record here. There is nothing in this record that suggests, even if you could take this retrofitted view of PAVIA, there is nothing in this record that suggests anything St. Paul did amounts to reckless and knowing indifference that it's insured would be held to a liability, which at the time would have to have been a clear liability, not just a possible liability, but a clear liability with respect to all doubts having been raised. Despite that, knowingly and indifferently exposed it's insured to extra contractual damages. The court, I won't go over everything here. Judge Chen did a pretty thorough job with this record and said no rational trier of fact could possibly find that to be the circumstance here. In fact, it's just the opposite, and she cites the specific provision, specific parts of the record. St. Paul at every turn was watching out for it's insured right. St. Paul was trying to protect it's insured against a potentially catastrophic injury, and St. Paul did just that. There's simply no bad faith in the situation. In terms of the indemnification issue, Your Honor, at the time the case was being settled, nobody was talking about, for good reason, the notion that the direct target defendant here, Triple Check, upon whom just about 80% of the liability, if not more, was being foisted upon, was going to somehow be able to under applicable law shift all of it's responsibility to the franchisor out in Long Island who was not on site, who was not the target defendant. There's clearly no clear liability of this indemnification to an extent beyond limits or otherwise that St. Paul knowingly disregarded in an act of bad faith. Even if, even if there was such a cause of action under these circumstances, and even if it was missed, as Judge Chet pointed out, in the worst possible scenario you have negligence. Not knowing indifference and reckless disregard, and you could look at Pavia for that. Even Pavia, which was a far more severe situation than anything alleged here, the Court of Appeals said, as a matter of law, it was improper for the jury in that case to have found there to be knowing indifference and reckless disregard. It's a pretty tough standard, and this Court has found that as well. You know, unless the Court has any questions, I'm going to rest on my brief and on Judge Chen's decision. Thank you. And Mr. Stein is reserved two minutes. Thank you, Your Honor. I first want to deal with the question that Judge Wesley raised because I forgot to add a point to this. If all of the claims against CITO International are resolved, that includes the claim that triggers the RLI policy, the claim by CITO International against its franchisee for indemnification. That eliminates the GL policy, the general liability policy. That's the position RLI took that leaves only the wasting policy, not enough to cover the case. That's $600,000 worth. This case settled for $2.25 million. That's an element that we plead as part of the bad faith. Yes, catastrophic results to CITO International as a result of that little settlement. That's the point. It was raised, ignored. I wish the Court to recognize that fact. Second, this concept of a direct target defendant doesn't make any sense. They're both defendants. That's St. Paul's own conjecture. In fact, the settlement offer, which is on page 11 of the decision, seeks $2 million to settle the claims against STSI. $2 million? Is that trivial? I don't think so. That was the demand. The case settled in total for $2.25 million. Now, we've heard discussion about Filberti and Pavia. I think it fits neatly in. We have a defendant here, St. Paul, who hires an attorney who provides only opinions with respect to its own policy and its own liability. And that attorney is supposed to represent CITO International. And to boot, he rigs the case with the plaintiff to submit a summary judgment motion to fix it So the Court rules a certain way to benefit his position with his carrier. That is wrong. It's Exhibit A to the complaint. We can't sit here and tolerate this. And I wish to add at the end of this, yes, I agree. I've been told this before. It might be 15 years since the New York Court has allowed a bad faith action to proceed. Now is the time. We shouldn't let carriers get away with this. And here, the last point I want to make is the Machiavellian one. I love it. St. Paul takes this position that, oh, no harm, no foul, as if we can ignore two years of litigation to get there. Because if they had gotten their way, and I hadn't, if they had gotten their way, catastrophic. CITO International would be out of business. And that's the point. Thank you. Open to questions. Thank you very much. Thank you.